UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

VALERIE G. STEEN,                    )
                                     )
          Plaintiff,                 )
                                     )      No. 4:07CV01361 FRB
                                     )
     v.                              )
                                     )
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
          Defendant.                 )


**MEMORANDUM AND ORDER**


     This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.   Procedural Background**

     On February 8, 2005, plaintiff Valerie G. Steen
("plaintiff") filed applications for a period of disability and
disability insurance benefits ("DIB") under Title II, and for
supplemental security income ("SSI") under Title XVI of the Social
Security Act, alleging disability as of October 6, 2003 due to
herniated, bulging and protruding discs, "old neck injury", and
degenerative bone loss.  (Administrative Transcript ("Tr.") at 46-
48; 88-90; 138.)  Plaintiff's applications were denied on April 25,
2005, and she filed a timely request for a hearing before an

administrative law judge ("ALJ"), which was held on April 10, 2006, before ALJ Myron Mills in Creve Coeur, Missouri. (Tr. 36; 19-23; 249-62.) On June 27, 2006, ALJ Mills issued his decision denying plaintiff's applications. (Tr. 16-23.) Plaintiff filed a timely Request for Review of the Hearing Decision with defendant Agency's Appeals Council, and attached a letter dated March 16, 2007 in support. (Tr. 6-14.) On May 30, 2007, the Appeals Council denied plaintiff's request for review. (Tr. 3-5.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Plaintiff's Testimony

During the hearing, plaintiff was represented by attorney Lawrence E. Ray, and testified on her own behalf. She was 46 years old at the time of the hearing, lived alone, was divorced, and had no minor children. (Tr. 251.) She is five feet three and one-half inches tall and weighed 240 pounds, which she estimated was 40 pounds more than her normal weight. (Tr. 251-52.) She is left handed, and is a high school graduate. (Tr. 252.) She was formerly employed as a production worker, but stopped working in October of 2003. Id. Plaintiff testified that her record reflected earnings in 2004 because she had received short-term disability benefits from her employer. Id. Plaintiff testified that she stopped working in 2003 due to back problems, and further

stated that she began having neck problems in 2001. <u>Id.</u> Surgery had been performed on her neck, but not her back. (Tr. 253.) She had not seen her doctor since June of 2005, and testified that she had lost her Medicaid, and no longer had funds for medical treatment. <u>Id.</u>

Regarding her neck surgery, plaintiff testified that she had a protruding disc and a broken piece of bone which caused numbness in her left arm, and an inability to hold on to objects. (Tr. 254.) Plaintiff testified that her surgery involved use of a cadaver disc, a metal plate, and two screws. <u>Id.</u> She testified that she still had numbness in her left hand and constant pain in her neck and shoulders. <u>Id.</u> Using a one-to-ten scale, plaintiff rated the pain and numbness at a seven on bad days, of which she had twenty per month, and a five on good days. (Tr. 254-55.) She testified that, even when she had been taking medicines, her pain was still at these levels. <u>Id.</u>

Plaintiff testified that she had been undergoing treatment with a Dr. Bondurant for her back when she lost her Medicaid benefits. (Tr. 255.) She rated her back pain as an eight, and testified that she had radicular symptoms, mainly on the right. <u>Id.</u> Plaintiff testified that, now that she has no Medicaid benefits, she uses an electric heat massaging mat, which she uses

for a total of about 90 minutes per day, and she also takes Aleve[1] daily. (Tr. 256-57.)

Plaintiff testified that, following her neck surgery, she returned to work for Kingsford, where she was making $15.01 per hour. (Tr. 257.) She described her job at Kingsford as the best job she ever had. Id.

Plaintiff testified that she is not experiencing "degeneration or bone loss" in any other area of her body. Id. She testified that she has trouble turning her neck, and cannot bend from the waist. Id. She testified that she has gained weight in the last two years due to inactivity. (Tr. 258.) Prior to June 2005, she had been seeing Dr. Daugherty once per month, and estimated that she had seen him a total of almost 20 times. Id.

Plaintiff testified that she had a driver's license, and drove once or twice per week. (Tr. 259.) She cannot drive far due to muscle spasms in her back, and right leg numbness. Id. Her daily activities included watching television, straightening up her home, making the bed, doing laundry, and some short walks outdoors. (Tr. 259-60.) She does no "major housework," and instead relies upon her mother to help her. (Tr. 260.) Plaintiff does her own grocery shopping, but stated that, if she stands more than 20 minutes, her legs feel "like they're about to fall off." Id.

---

[1]Aleve, or over-the-counter Naproxen, is used to reduce fever and to relieve mild pain from headaches, muscle aches, arthritis, menstrual periods, the common cold, toothaches, and backaches.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

Plaintiff testified to feeling a "lot of pain in the lower part of my back and then it runs down my legs." (Tr. 260-61.)

B. <u>Medical Records</u>

The record indicates that, on July 23, 2001, W. Blake Rodgers, M.D., performed anterior cervical discectomy, bilateral foraminotomy and osteophytectomy at C6-7 with fusion of C6 to C7 at Capital Region Medical Center ("CRMC") in Jefferson City, Missouri. (Tr. 160-61.)

Records from Belle Family Health Center in Belle, Missouri indicate that plaintiff was seen by Richard Daugherty, M.D. on March 20, 2003 for a "Kingsford rescue respirator" clearance physical. (Tr. 206.) Plaintiff reported a history of eczema, tobacco use, and claustrophobia, and a past surgical history of anterior cervical diskectomy, and reported occasional trouble moving her neck, secondary to that past surgery. <u>Id.</u> Physical exam was normal, but plaintiff was noted to experience shortness of breath upon exertion. <u>Id.</u> Based upon this and upon her reported claustrophobia, Dr. Daugherty opined that plaintiff was a poor candidate for rescue respirator use. <u>Id.</u>

On October 9, 2003, plaintiff saw Dr. Daugherty with complaints of lower back pain, and a "pins and needles" sensation in her right leg, after having spent two to three workdays on a ladder, painting. (Tr. 205.) Straight leg lifts were positive, and plaintiff had decreased range of motion of her back. <u>Id.</u> Dr. Daugherty assessed back pain/possible sciatica, prescribed

-5-

Anaprox[2], and instructed plaintiff to remain off work for four days. Id.

Plaintiff returned to Dr. Daugherty on October 14, 2003 and reported some improvement with Anaprox, but that she still experienced right leg numbness with radiation into her toes. (Tr. 204.) Dr. Daugherty assessed a lumbar strain, prescribed Ultram,[3] ordered an MRI and instructed plaintiff to remain off work until the MRI was performed. Id. Dr. Daugherty also indicated that, if the MRI was negative, plaintiff would begin physical therapy. Id.

An MRI of plaintiff's lumbar spine, performed on October 16, 2003, revealed mild degenerative changes in the left lateral recess and neural foramina at L3-L4 and L4-L5, with no focal disc herniation. (Tr. 165.) At T12-L1, central broad based disc herniation was noted, and it was opined that a thoracic MRI may be helpful. Id.

The record reflects that plaintiff underwent physical therapy from October 21, 2003 through December 19, 2003 at the Outpatient Rehab & Sports Medicine Center in Owensville, Missouri. (Tr. 217-48.) During her initial visit, plaintiff reported being

---

[2]Anaprox, or prescription Naproxen, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), juvenile arthritis (a form of joint disease in children), and ankylosing spondylitis (arthritis that mainly affects the spine).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

[3]Ultram, or Tramadol, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

off work from Kingsford Charcoal, and it was noted that she had a positive attitude towards therapy. (Tr. 245.) She was able to sleep, but had difficulty sitting. Id. Swelling and muscle spasm were noted in her T12 area, and she was very tender to palpation in her right gluteal area. (Tr. 246.) On November 11, 2003, plaintiff presented for physical therapy and reported that she had over-exerted herself at home the preceding day, "preparing for winter", and that she could hardly get out of bed. (Tr. 234.) On December 11, 2003, plaintiff reported that her back was better, but that a lot of walking caused complications. (Tr. 222.) It was noted that she was advancing with low level lumbar stabilization, with decreasing back pain. Id. During her physical therapy session on December 19, 2003, she reported feeling better, and that standing at the stove the preceding day had not bothered her. (Tr. 218.) She reported that the use of shoe inserts was helpful, but that pain recurred with excessive walking, defined as more than two hours. Id. During another session, she reported having experienced a bad spell, but that she was now better. (Tr. 225.) She reported increased back pain with walking "any distance", but that stretching alleviated her pain. Id. The therapist noted that, overall, plaintiff had shown gains in mobility and strength. Id.

Plaintiff saw Dr. Daugherty on January 5, 2004 with complaints of head and chest congestion, a productive cough with blood-tinged sputum, fever and chills, and for reevaluation of her

lumbosacral strain. (Tr. 201-03.) She reported that her back was doing better, and that she had minimal, burning-type sensation of her lower lumbosacral musculature. (Tr. 201.) It was noted she was taking Tramadol (Ultram). (Tr. 203.) She also reported mild sciatica symptoms, but that this was better overall. (Tr. 201.)

Dr. Daugherty noted that her MRI revealed central broad-based disc herniation at T12-L1, and that she had more discomfort lower at the L4-L5 and L5-S1 areas. Id. Upon exam, Dr. Daugherty noted that plaintiff was in minimal discomfort. Id. Plaintiff's neck was normal with good range of motion, but she was tender along her lower lumbosacral area, with a nodular area, cystic in nature, along the right lower lumbosacral spine. Id. There was no muscle spasm or reproducible sciatica symptoms. (Tr. 201.) Dr. Daugherty diagnosed plaintiff with bronchitis and prescribed antibiotics, and also diagnosed "lumbosacral strain/disc herniation/disc bulge", and instructed plaintiff to continue taking Ultram and a muscle relaxant. (Tr. 202.) He ordered an ultrasound to evaluate the nodular area. Id.

Plaintiff returned to Dr. Daugherty on January 26, 2004, and it was noted that the ultrasound revealed no cystic formation. (Tr. 198, 214.) Plaintiff advised that the area had improved, but that she had experienced an exacerbation of back pain after shopping on Saturday. Id. Upon exam, she was noted to be in minimal discomfort. Id. Exam of plaintiff's neck was normal, but plaintiff had discomfort to palpation in her thoracic spine, with

-8-

some muscle spasm to her lumbosacral area.  <u>Id.</u>  Straight leg raises mildly increased back pain bilaterally.  <u>Id.</u>  Dr. Daugherty continued plaintiff on Anaprox and Ultram, prescribed Flexeril[4], and ordered an MRI, and instructed plaintiff to continue range of motion/stretching exercises at home.  (Tr. 198-99.)

An MRI of plaintiff's thoracic spine, performed on February 2, 2004, revealed prominent left paracentral disc protrusion at T12-L1, with encroachment upon the descending nerve roots on the left side.  (Tr. 162.)

Plaintiff returned to Dr. Daugherty on February 11, 2004 for follow-up.  (Tr. 195-96.)  She reported continued sharp back pain that she rated as a five on a one-to-ten scale.  (Tr. 195.) She had minimal spasms at times.  <u>Id.</u>  She requested pain clinic evaluation, and Dr. Daugherty noted that although her most recent MRI revealed prominent left paracentral disc protrusion at T12-L1, with encroachment upon the nerve roots on the left, plaintiff reported symptoms on the right.  <u>Id.</u>  No spasm was noted, and straight leg raise was negative on the left and positive on the right.  <u>Id.</u>  Dr. Daugherty noted that plaintiff's right sciatica was contrary to her MRI results, but indicated he would await plaintiff's evaluation by a spine specialist, and refer her to a pain clinic at her request.  (Tr. 195.)  Plaintiff indicated that

_____

[4]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

she had discontinued Tramadol due to fatigue, but Dr. Daugherty advised she continue taking it because it helped her pain. Id. Dr. Daugherty opined that plaintiff should not lift anything greater than five pounds, and should not bend, twist or turn. (Tr. 196.)

Plaintiff returned on March 11, 2004 with complaints of pain that she rated as a six on a one-to-ten scale, which Dr. Daugherty attributed to plaintiff's having exhausted her supply of Ultram. (Tr. 192.) Plaintiff stated that Ultram reduced her pain to a two. Id. She was noted to have some discomfort with range of motion of the back, but fair range of motion of the neck. Id. Straight leg raises were positive. Id. Plaintiff was scheduled to see a spine specialist, and for pain clinic evaluation. (Tr. 193.)

On April 5, 2004, plaintiff was seen by Charles P. Bondurant, M.D., a neurological surgeon, with complaints of low back pain with referral into her right lower extremity. (Tr. 171-73.) Plaintiff gave a history of having been thrown from a horse at the age of 17, resulting in a pelvic fracture that she believed had healed poorly. (Tr. 171.) Plaintiff reported that, in the two to three years preceding the evaluation, she had begun to experience occasional low back pain with occasional radiation into the right buttock and right thigh, which waxed and waned with activity. Id. These symptoms worsened in approximately October 2003, with additional symptoms of coldness and tingling in her right foot. Id. She reported that physical therapy was of no

benefit, and Naprosyn[5] was "of mixed benefit."  Id.

Upon exam, Dr. Bondurant found that lower extremity strength was 5/5; sensation was accurate; straight leg raise was negative on the left but created some buttock and posterior thigh discomfort on the right; and Patrick's maneuver created some hip joint discomfort on the left and posterior thigh discomfort on the right.  (Tr. 172.)  Dr. Bondurant noted that plaintiff's October 2003 lumbar spine MRI revealed findings at T12-L1, and that her history and exam raised suspicion for a lumbosacral radicular irritation, perhaps at S1.  (Tr. 172-73.)  Dr. Bondurant then wrote that there was "an apparent mismatch between her symptoms and studies", and that the thoracolumbar changes might be "incidental and asymptomatic."  (Tr. 173.)  Dr. Bondurant recommended that plaintiff undergo a series of injections, and instructed her to pay close attention to how and when her discomfort changed as she underwent the injections in an attempt to understand "the generator of her discomfort."  Id.  July 17, 2008

On April 6, 2004, plaintiff underwent trigger point injection at the Phelps County Regional Medical Center with Glenn A. Kunkel, M.D.  (Tr. 185.)  Plaintiff stated that Flexeril had been helping.  Id.

Plaintiff returned to Dr. Daugherty on April 14, 2004,

---

[5]Naprosyn is used to relieve pain, tenderness, swelling and stiffness associated with different types of arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

reporting that she had undergone trigger point injections, would receive epidural injections the following day, and would also see Dr. Bondurant.  (Tr. 190.)  Upon exam, she was found to be in "minimal discomfort", and straight leg raises were negative.  Id. There was no muscle spasm, and there were no reproducible sciatica symptoms.  Id.  Dr. Daugherty noted that plaintiff's back pain and sciatica were slowly improving.  Id.  This is the last treatment note from Dr. Daugherty.

On April 16, 2004, plaintiff underwent selective nerve root block injections at L3 and L4.  (Tr. 183.)  Plaintiff tolerated the procedure well, and was discharged.  Id.  A follow up note indicated that plaintiff had minimal changes in the lumbar spine per MRI, and had some mild degenerative changes, but that her radicular pattern was not consistent with the T12 disc.  Id.

On May 5, 2004, plaintiff again underwent selective nerve root blocks at L3 and L4.  (Tr. 180.)  She reported that, following the first injection, her pain was 60% improved, and she was still 40% improved after three weeks.  Id.  Plaintiff underwent another SI injection on June 2, 2004.  (Tr. 178.)

In a July 23, 2004 letter to the Disability Determinations department of defendant agency, Dr. Bondurant wrote that he had seen plaintiff in April 2004 for low back pain with right lower extremity radiation, but that follow-up had been postponed, apparently due to transportation issues.  (Tr. 170.) Dr. Bondurant wrote that he "would have difficulty commenting at

-12-

this point on her ability to complete activities in the workplace",
and that he was planning further follow-up.  Id.

Plaintiff saw Dr. Bondurant on February 21, 2005.  (Tr.
168-69.)  She reported having undergone a series of epidural
steroid injections and trigger point injections to address her back
and lower extremity discomfort, but that the injections provided
only temporary relief. (Tr. 168.) She complained of discomfort in
and near the lumbosacral junction which moved into her right
buttock and down her right thigh and calf, and which was
exacerbated by prolonged walking and standing, but improved by
sitting and resting.  Id.  Plaintiff reported having started
Neurontin, but stopped taking it after seeing a television
commercial about the drug.  Id.  Dr. Bondurant noted that plaintiff
had no new medical diagnoses, and that she was not taking any
medications.  Id.

Upon exam, her lower extremity strength was 5/5 in all
groups, and sensation was normal.  (Tr. 168.) Both Patrick's
maneuver and straight leg raise were "uneventful" on the left, but
created buttock pain on the right.  Id.  Plaintiff's gait was
"brisk and stable."  Id.  She complained of "some right lower
extremity discomfort reminiscent of her past discomfort."  Dr.
Bondurant noted that plaintiff's history and physical raised a
concern of radicular irritation at S1, although MRI was not
supportive.  Id. Dr. Bondurant wrote that plaintiff had "realized
significant benefit" from Neurontin in the past, noted that he and

plaintiff discussed potential benefits and potential side effects, and wrote "it sounds as though the potential good effects for Ms. Steen may outweigh the potential side effects." (Tr. 168.) Dr. Bondurant then noted, "I have discussed that failure of additional nonoperative effort would theoretically prompt additional evaluation in an attempt to understand the apparent mismatch between clinical presentation and the magnetic resonance image." (Tr. 168-69.) Dr. Bondurant noted that he would not reschedule plaintiff to see him on a regular basis, but instructed that she call if her condition worsened. (Tr. 169.)

On April 25, 2005, medical consultant M. Bax completed a physical residual functional capacity assessment, and assessed plaintiff as having the following limitations and abilities: the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; the ability to stand and/or walk and sit for about six hours in an eight-hour day, and push and/or pull without limitation. (Tr. 113.) Consultant Bax noted that plaintiff reported feeling slightly improved, but continued to complain of back pain exacerbated by prolonged standing/walking. Id. It was noted she had been taking Neurontin but stopped after viewing a television commercial, and was currently taking no medication. Id. Upon exam, left upper extremity strength was 5/5 with intact sensation; deep tendon reflexes were 2+/4 below her knees, 2+/4 at the left ankle, and 1+/4 at the right ankle. Id. She had a negative straight leg raise on the left, but the test created

-14-

buttock pain on the right. (Tr. 113.) It was noted that plaintiff could perform all postural limitations "occasionally", and the only manipulative limitation noted was reaching. (Tr. 114-15.) Plaintiff's gait was found to be brisk/stable, and it was noted that the "above limitations have been given so as not to exacerbate symptoms." Id.

Consultant Bax wrote that plaintiff reported being able to do a few household chores, could cook once daily, do laundry, wash dishes, and tidy all day long once per week, and shop for groceries and cleaning supplies once a month. (Tr. 117.) Plaintiff indicated that her son did the heavier duties. Id. She left her home twice per day, and was able to drive without difficulty. Id. She was no longer able to ride horses or ride in a boat as she once did. Id. She said she was able to lift about 40 pounds. (Tr. 117.) It was noted that her allegations were considered to be credible given the objective medical evidence in the file. Id.

A June 23, 2005 MRI of plaintiff's lumbar spine, apparently ordered by Dr. Daugherty, revealed disc protrusion at T12-L1, mild annular bulge at L3-4 and L4-5, and no specific abnormality at L5-S1. (Tr. 158, 166.)

On June 30, 2005, Dr. Daugherty completed a "Physical Residual Functional Capacity Assessment Form". (Tr. 148-52.) Dr. Daugherty does not indicate that he examined plaintiff on this date. Regarding plaintiff's abilities during an eight-hour

workday, Dr. Daugherty opined that plaintiff could sit for five to
six hours in an eight-hour workday, and could stand/walk for one.
(Tr. 148.)  Under the entry "work", Dr. Daugherty wrote "depends on
type of work."  Id.  Dr. Daugherty indicated that plaintiff had
significant exacerbation of back pain with walking and standing
more than ten minutes, and that she required frequent position
changes.  Id.  He indicated that plaintiff could frequently lift
and carry ten pounds, occasionally lift and carry eleven to twenty
pounds, and could never lift and carry over 21 pounds, due to
worsening back pain. (Tr. 148-49.)  Dr. Daugherty indicated no
manipulative limitations involving plaintiff's hands or feet, but
did indicate that she had increasing numbness of her digits for
which she was undergoing work-up.  (Tr. 149.)  He indicated
plaintiff could occasionally bend, squat, reach above, and stoop,
but could never crawl, climb, crouch or kneel, as doing so would
cause significant exacerbation of back pain.  (Tr. 150.)  Dr.
Daugherty indicated plaintiff's pain was "moderate," which was
defined as able to be "tolerated but would cause marked handicap in
the performance of the activity precipitating pain," and described
her pain as continuous and daily. (Tr. 150-51.)  He concluded that
plaintiff had the medically determinable impairments of leg
weakness, limited range of motion of her back, and limited
functioning capacity, due to thoracic and lumbar disc pathology.
(Tr. 151.)  Dr. Daugherty indicated that these impairments could be
expected to produce pain.  (Tr. 150.)  Dr. Daugherty noted the

objective indicators of pain as reduced range of motion, motor disruption and muscle spasm, and the subjective indicators as complaints of pain, insomnia, weight instability, irritability, and grimacing. (Tr. 151.) Dr. Daugherty indicated that plaintiff's mental activities were limited secondary to pain and pain medications. <u>Id.</u> He opined that position changes, rest, and medications relieved plaintiff's pain, but that physical therapy and epidural injections were of no benefit. (Tr. 152.) Regarding whether there were any specific medical reasons why plaintiff should not work, Dr. Daugherty wrote "[t]his could potentially worsen back pain and disk related issues. Potential for danger to herself and others around her due to limitations and medications." <u>Id.</u>

## III.    The ALJ's Decision

The ALJ noted that plaintiff had been diagnosed with disc herniation, and found that plaintiff had a severe impairment because she had more than a slight abnormality having more than a minimal effect on her ability to work, but that her impairment was not of listing-level severity. (Tr. 20.) The ALJ then noted his duty to determine plaintiff's RFC, and his obligation to review her complaints in accordance with the Eighth Circuit's decision in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

The ALJ discussed plaintiff's treatment with Drs. Daugherty and Bondurant, and concluded that plaintiff did not meet

Listing 1.04 for disorders of the spine. (Tr. 20-21.) He noted that there was no evidence of nerve root compression, limitation of motion of the spine, motor loss, sensory or reflex loss, or positive straight leg raising, and that plaintiff had no problems ambulating and did not require an assistive device. (Tr. 21.) The ALJ also noted that plaintiff had reported in February 2005 that she was not taking medications; that she reported during the April 2006 hearing that she was taking only Aleve, a non-prescription pain medication; that she was not receiving ongoing medical treatment; and that she did not appear to be in pain during the hearing. Id. The ALJ wrote that neither Dr. Bondurant nor Dr. Daugherty opined that plaintiff was disabled and unable to work. Id. The ALJ noted that, for several reasons, he was not giving controlling weight to Dr. Daugherty's physical residual functional capacity assessment. Id. The ALJ noted that Dr. Bondurant indicated that he would have difficulty commenting on plaintiff's abilities a mere two months after seeing her. (Tr. 21.) The ALJ further noted that Dr. Daugherty's RFC assessment was inconsistent with his treatment notes. Id.

The ALJ concluded that plaintiff's allegations of symptoms precluding all work were not credible, and that her impairments did not preclude standing and walking two hours in an eight-hour day, sitting throughout a work day, and occasionally lifting ten pounds, and plaintiff thus retained the RFC to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567

-18-

and 416.967.[6]  Id.  The ALJ noted that none of the examining doctors described functional limitations precluding basic sedentary work activities, and that even Dr. Daugherty found that plaintiff could stand and walk two hours, sit for five to six hours, and lift and carry ten or even 20 pounds.  The ALJ concluded that plaintiff was limited to sedentary work, and could not perform her past relevant work.  The ALJ concluded that plaintiff did not have an impairment or combination of impairments of listing-level severity, and used the Guidelines to direct a finding that plaintiff was not under a disability as defined in the Act at any time through the date of his decision.  (Tr. 23.)

## IV.      Discussion

To be eligible for benefits under the Social Security Act, a plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  It provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

---

[6]Sedentary work is defined as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 404.1567.

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1520, 416.920. It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Heckler v. Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step sequential evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen</u>, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has

the residual functional capacity to perform his past relevant work.
If so, the claimant is not disabled. If not, the burden then
shifts to the Commissioner to prove that there are other jobs that
exist in substantial numbers in the national economy that the
claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v.
Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the
claimant is declared disabled and becomes entitled to disability
benefits.

The Commissioner's findings are conclusive upon this
Court if they are supported by substantial evidence. 42 U.S.C. §
405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young
o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf
v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial
evidence is less than a preponderance but enough that a reasonable
person would find adequate to support the conclusion. Briggs v.
Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether
the Commissioner's decision is supported by substantial evidence,
the Court must review the entire administrative record and
consider:

1.   The credibility findings made by the ALJ;

2.   The plaintiff's vocational factors;

3.   The medical evidence from treating and
     consulting physicians;

4.   The plaintiff's subjective complaints
     relating to exertional and non-exertional
     activities and impairments;

-21-

5.  Any corroboration by third parties of the plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff argues that the ALJ's decision is legally insufficient because he: (1) failed to properly review the medical evidence and failed to properly evaluate plaintiff's subjective complaints; (2) failed to give "great weight" to Dr. Daugherty's RFC assessment; (3) failed to meet the burden of producing evidence that plaintiff retained the ability to do work that exists in the national economy; (4) failed to obtain the testimony of a vocational expert; and (5)failed to evaluate the combined effects of all of plaintiff's impairments including pain and medication side effects. Plaintiff also argues that there is no evidence in the record that she is able to perform any basic

work activities, and that she need not be bedridden or completely helpless to be found disabled. In response, the Commissioner contends that substantial evidence supports the ALJ's decision. The Commissioner's arguments are well-taken.

A review of the record reveals that the ALJ properly determined that plaintiff's impairments were not of listing-level severity, and that her allegations of disabling pain were not credible. "A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged physical impairment. Polaski, 739 F.2d at 1321; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d at 1321–22. In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1)

-23-

the claimant's daily activities; (2) the
duration, frequency and intensity of the pain;
(3) precipitating and aggravating factors; (4)
dosage, effectiveness and side effects of
medication; (5) functional restrictions."

Id. at 1322.

Although the ALJ may not accept or reject the claimant's
subjective complaints based solely upon personal observations, he
may discount such complaints if there are inconsistencies in the
evidence as a whole. Id. The "crucial question" is not whether
the claimant experiences symptoms, but whether his credible
subjective complaints prevent him from working. Gregg v. Barnhart,
354 F.3d 710, 713-14 (8th Cir. 2003). The foregoing Polaski
factors are to be considered in addition to the objective medical
evidence of record. See Baldwin v. Barnhart, 349 F.3d 549, 558
(8th Cir. 2003). When an ALJ considers the Polaski factors and
discredits a claimant's subjective complaints for a good reason,
that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962
(8th Cir. 2001). The credibility of a claimant's subjective
testimony is primarily for the ALJ, not this Court, to decide, and
this Court considers with deference the ALJ's decision on the
subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, the ALJ reviewed and discussed
plaintiff's 2001 surgery, her treatment with Drs. Daugherty and
Bondurant, and her MRI results. (Tr. 19-21.) The ALJ noted that
plaintiff did not meet the listing for disorders of the spine,

inasmuch as the medical evidence of record failed to document nerve root compression, limitation of motion of the spine, motor loss, sensory or reflex loss, or positive straight leg raising.  The ALJ also noted that plaintiff did not use an assistive device, and that the medical evidence did not document that plaintiff had trouble ambulating.  While the lack of objective medical evidence is not dispositive, it is an important factor.  See Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997).  Furthermore, the undersigned notes the repeated instances in Dr. Bondurant's treatment notes that plaintiff's MRI results were inconsistent with her subjective complaints.  Complaints of pain will not be found to affect a claimant's ability to work unless medical signs or laboratory findings link such complaints to an impairment reasonably expected to produce such symptoms.  20 C.F.R. §§ 404.1529(b); 416.929(b).

The ALJ noted that plaintiff reported that Neurontin significantly improved her pain, and the undersigned notes that plaintiff told Dr. Daugherty that Ultram reduced her pain from a six to a two on a one-to-ten scale.  (Tr. 192.)  This is inconsistent with her hearing testimony, during which she stated that her prescription medications gave little relief.  (Tr. 255.) As the ALJ noted, impairments that are controllable with medication cannot be considered disabling.  Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).  Furthermore, plaintiff did not report significant side effects from any of her medications to her doctors, and it is in

fact indicated in her Disability Report that she had no side effects from Flexeril, Naproxen or Neurontin. (Tr. 144.) If plaintiff did suffer side effects that were seriously impairing her functioning, it is reasonable to assume that she would have informed her physicians so that medication adjustments could be made. See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994); Richmond v. Shalala, 23 F.3d 1441, 1443 (8th Cir. 1994).

The ALJ also noted that the fact that plaintiff was taking only non-prescription medication, and was receiving no ongoing medical care, contradicted her allegations of disability precluding all work. Taking only over-the-counter pain medication instead of strong prescription pain medication is inconsistent with allegations of disabling pain. Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999) (The lack of strong prescription pain medication supports the ALJ's finding of no disability); Loving v. Dep't. of Health & Human Services, 16 F.3d 967, 971 (8th Cir. 1994) (over-the-counter medications are inconsistent with complaints of disabling pain). The lack of ongoing medical treatment is also inconsistent with complaints of pain and allegations of a disabling condition. See Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992); see also Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subject complaints of disabling conditions).

Regarding plaintiff's lack of ongoing medical treatment,

the ALJ noted that plaintiff last saw Dr. Daugherty in April 2004, and last saw Dr. Bondurant in February 2005. Plaintiff contends, however, that the evidence documents that plaintiff saw Dr. Daugherty on June 30, 2005, and that medical records and MRI reports are dated October 2003 through June 2005, and challenges the ALJ's consideration of her lack of medical treatment as a basis for discounting her complaints. Review of the record, however, supports the ALJ's conclusion.

The last treatment note from Dr. Daugherty is dated April 14, 2004. At that time, Dr. Daugherty noted that plaintiff had undergone trigger point injections, would receive epidural injections the following day, and would then see Dr. Bondurant. (Tr. 190.) Upon exam, Dr. Daugherty found plaintiff to be in minimal discomfort, with negative straight leg raises, and Dr. Daugherty noted that plaintiff's back pain and sciatica were slowly improving. Id. Although Dr. Daugherty completed a physical residual functional capacity assessment form on June 30, 2005 (and also apparently ordered that an MRI be done in advance of his completion of this form) it is not entirely clear whether Dr. Daugherty actually saw plaintiff on this date, or whether he completed the form by reviewing his past treatment notes. However, even assuming, arguendo, that Dr. Daugherty did see plaintiff on this date, the undersigned could not conclude that seeing plaintiff for the purpose of completing an RFC assessment could be considered ongoing medical treatment.

The last treatment note from Dr. Bondurant is dated February 21, 2005, ten months after she last saw him. (Tr. 168-69.) It was noted plaintiff was not taking any medications. (Tr. 168.) Dr. Bondurant noted that plaintiff had realized "significant benefit" from Neurontin, that he was not scheduling her to return to see him on a regular basis, but that she should call if her condition worsened. Id.

Finally, the record contains a report of a lumbar spine MRI, apparently ordered by Dr. Daugherty, dated June 23, 2005, which indicated mild annular bulge at L3-4, and bulge at L4-4, with "no specific abnormality" at L5-S1. (Tr. 158, 166.) The record contains no evidence of any treatment notes associated with this MRI report, nor does it appear that plaintiff underwent any follow-up medical treatment after the MRI. Furthermore, the record contains no evidence indicating that attempts were made to obtain additional or updated medical records.

Plaintiff contends that the reason she was not receiving ongoing medical care or taking prescription pain medication was because she lost her Medicaid benefits, and could not afford prescriptions or doctor visits. As the Eighth Circuit has noted, while evidence of financial hardship may justify a claimant's failure to obtain treatment or take prescription medication, it is not an automatic excuse. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989);

Brown v. Heckler, 767 F.2d 451, 453 n. 2 (8th Cir. 1985). While plaintiff's loss of Medicare must have been a blow to her personal finances, she offered no explanation regarding why she lost her Medicaid coverage, and the record does not indicate that she made any attempts to secure low-cost prescriptions and/or medical care. Assertions of lack of financial resources are not convincing where plaintiff made no effort to take advantage of any available medical assistance programs. Johnson, 866 F.2d at 275. Furthermore, when Dr. Bondurant saw plaintiff on February 21, 2005, he noted that she was not taking any medications. Plaintiff did, however, apparently have the financial resources at this time to see Dr. Bondurant. This tends to suggest that plaintiff did not take prescription pain medication because she did not feel the need for it. Plaintiff's loss of Medicare coverage does not excuse plaintiff's lack of ongoing medical care, or the fact that she takes only non-prescription pain medication.

The ALJ also noted that plaintiff did not appear to be in pain during the hearing, an observation plaintiff challenges inasmuch as the hearing was short. However, as the Eighth Circuit has noted, an ALJ's "personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) (citing Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993)). Furthermore, while an ALJ may not reject a claimant's complaints based solely upon personal observations, he

may do so if there are inconsistencies in the record as a whole. Polaski, 739 F.2d at 1332. As explained above, this is the case here.

The ALJ in this case properly evaluated the medical evidence of record, and properly discredited plaintiff's subjective complaints of disabling pain precluding all work. The ALJ cited the Polaski decision, listed all of the relevant factors, thoroughly analyzed those factors based upon the evidence of record, and found plaintiff's complaints incredible. As noted above, when an ALJ explicitly considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld. Hogan, 239 F.3d at 962.

Plaintiff next contends that the ALJ erred by failing to give "great weight" to Dr. Daugherty's June 30, 2005 RFC assessment. Plaintiff notes that Dr. Daugherty opined that there were medical reasons why she should not work, and that the severity of her pain was moderate, continuous and daily, with subjective and objective pain indicators. Review of the record reveals no error in the weight the ALJ assigned to Dr. Daugherty's RFC assessment.

The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Consistent with the

regulations, the Eighth Circuit has stated that a treating physician's opinion is "normally entitled to great weight," Rankin, 195 F.3d at 430, but has also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995). Accordingly, the Eighth Circuit has upheld an ALJ's decision to discount or even disregard the opinion of a treating physician when it consists merely of vague and conclusory statements, Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001), and when it is inconsistent with his or her treatment records. Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007). Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to the opinion. 20 C.F.R. § 404.1527(d)(2); Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000).

In his RFC assessment, Dr. Daugherty opined that plaintiff could frequently lift up to ten pounds, and occasionally lift eleven to twenty. He opined that plaintiff could sit for five to six hours in an eight-hour workday; could stand for one hour, and walk for one hour. He also indicated that her ability to work during an eight-hour workday depended upon the type of work. Dr. Daugherty also wrote, in response to the question whether there were medical reasons plaintiff should not work, "[t]his could potentially worsen back pain and disk related issues. Potential

for danger to herself and others around her due to limitations and medications." (Tr. 152.)

The ALJ wrote that he had considered Dr. Daugherty's opinion and declined to give it controlling weight for several reasons. First, the ALJ noted that Dr. Daugherty had last seen plaintiff two years before he completed the report. It was not error for the ALJ to consider the length of time that had elapsed between the doctor's last assessment of the plaintiff and his preparation of the assessment form. See Casey v. Astrue, 503 F.3d 687 (8th Cir. 2007) (ALJ properly discredited treating rheumatologist's opinion on the basis of the infrequent nature of treatment visits.) The ALJ also noted that Dr. Daugherty's assessment was inconsistent with his own treatment records. The ALJ noted that when Dr. Daugherty last examined plaintiff in April of 2004, he noted no muscle spasms or reproducible sciatic symptoms, noted that straight leg raises were negative, and that plaintiff reported her back pain as mild. It is proper for an ALJ to decline to give controlling weight to a treating physician's opinion because his treatment notes are inconsistent with his residual functioning capacity assessment. Davidson v. Astrue, 501 F.3d 987, 990-91 (8th Cir. 2007) (finding an ALJ correctly discounted a physician's assessment report when his treatment notes contradicted the report); see also Prosch, 201 F.3d at 1013 (A treating physician's own inconsistency can diminish or eliminate the weight given his opinions.)

-32-

In his decision, the ALJ found it significant that no physician opined that plaintiff was disabled and unable to work, and plaintiff contends that the ALJ erred in failing to give controlling weight to Dr. Daugherty's statement that there were medical reasons she should not work. The undersigned disagrees, and finds no error in the ALJ's decision to disregard Dr. Daugherty's opinion. As noted above, earlier on the assessment form, Dr. Daugherty offered several opinions regarding plaintiff's ability to function in the workplace, including lifting abilities and her abilities to sit, stand and walk during an eight-hour workday; and he also indicated that plaintiff's ability to work during an eight-hour day depended upon the type of work. Obviously, such opinions are inconsistent with an opinion that a claimant should not work. Flynn v. Astrue, 513 F.3d 788, 793 -794 (8th Cir. 2008)(Internal inconsistencies justified ALJ's decision to decline to give controlling weight to treating rheumatologist's questionnaire responses.)

Finally, as the Commissioner notes, the abilities and limitations assessed by Dr. Daugherty are not entirely inconsistent with the ALJ's RFC assessment. The ALJ concluded that plaintiff retained the residual functional capacity to perform the full range of sedentary work. Sedentary work is defined as involving lifting no more than 10 pounds at a time; occasionally lifting or carrying articles like docket files, ledgers, and small tools; involving mainly sitting; and involving a certain amount of walking and

-33-

standing.   20 C.F.R. § 404.1567.   Dr. Daugherty opined that plaintiff was able to lift and carry ten or even 20 pounds; could sit for five to six hours; stand for one hour; and walk for one hour during an eight-hour workday.

The undersigned concludes that the ALJ gave appropriate weight to Dr. Daugherty's June 30, 2005 Physical Residual Functional Capacity Assessment Form, and that he offered good reasons for the weight given.

Plaintiff next contends that the ALJ did not meet his burden of enumerating the other jobs that plaintiff could do after finding she could not return to her past relevant work, and also erred by failing to obtain vocational expert testimony.   The undersigned disagrees.

As discussed above, an ALJ utilizes a five step analysis to determine whether a claimant is disabled.   Through step four, the claimant carries the burden of establishing that he is unable to perform his past relevant work.   Pearsall, 274 F.3d at 1219 (citing Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)).   At step five, however, the burden shifts to the Commissioner to establish that the claimant retains the residual functional capacity to perform a significant number of jobs that exist in the national economy.   Id.   There are two means by which the Commissioner can meet its burden at step five: reliance upon the Guidelines, or obtaining VE testimony.   "If an applicant's impairments are exertional, (affecting the ability to perform

-34-

physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). If the claimant has non-exertional impairments, use of the Guidelines is inappropriate, and VE testimony is required. Pearsall, 274 F.3d at 1219 (citing Banks v. Massanari, 258 F.3d 820, 827 (8th Cir. 2001)). However, if the ALJ explicitly discredits the claimant's subjective allegations for legally sufficient reasons, the ALJ may use the Guidelines to meet his step five burden. Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987); see also Reynolds v. Chater, 82 F.3d 254, 258-59 (8th Cir. 1996); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Cruse, 867 F.2d at 1187.

As discussed above, the ALJ in this case explicitly discredited plaintiff's subjective allegations of pain for legally sufficient reasons. Also as discussed above, the record does not establish that plaintiff suffers from medication side effects, and plaintiff in fact testified that she is not even taking strong pain medication which might potentially cause side effects. The undersigned therefore concludes that vocational expert testimony was not required in this case, and the ALJ's reliance upon the Guidelines was proper. See Bolton, 814 F.2d at 538; see also Reynolds, 82 F.3d at 258-59; Carlock, 902 F.2d at 1343; Cruse, 867

F.2d at 1187.

Plaintiff next contends that there is no evidence in the record that plaintiff can perform any basic work activities, or work on a sustained basis for eight hours per day, five days per week. Plaintiff's argument is not compelling. While it is true that an ALJ must determine a claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). The claimant bears the burden of establishing his RFC. Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

Finally, plaintiff's contention that the ALJ failed to consider the combined effect of her alleged impairments is not supported by the record. As noted, supra, the ALJ discussed plaintiff's impairments, and specifically found that she did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 20.) Preceding this statement, the ALJ specifically noted his duty to consider plaintiff's impairments individually and in combination. This analysis is sufficient. "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Browning, 958 F.2d at 821 (citing Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987)).

Therefore, for all of the foregoing reasons, the

Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001; <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

FREDERICK R. BUCKLES
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of July, 2008.